IN RE: ASBESTOS PRODUCTS
LIABILITY LITIGATION (No. VI)

CONSOLIDATED WITH MDL NO. 875

---

**This Document Relates To:**

---

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

TARSIA WILLIAMS AND
BRECK WILLIAMS

E.D. Pa. Case No. 2:09-cv-70101-ECR-MFA

E.D. La. Case No. 2:09-cv-00065-ILRL-JCW

VERSUS

LOCKHEED MARTIN CORPORATION, OWENS-ILLINOIS, INC., CBS
CORPORATION, FOSTER WHEELER CORPORATION, GENERAL ELECTRIC
COMPANY, UNIROYAL, INC., THE McCARTY CORPORATION, EAGLE, INC.,
TAYLOR-SEIDENBACH, INC., REILLY-BENTON COMPANY, INC., CSR, LTD.,
ADVOCATE MINES, LTD., THE BOEING COMPANY, SEVILLE, INC., STANDARD
SERVICES COMPANY, INC., AIR PRODUCTS & CHEMICALS, INC., EXXON
MOBIL CORPORATION, NEW NGC, INC., INSULATION TECHNOLOGIES, INC.,
HY-TECH ROOFING SERVICES, INC., LOU-CON, INC., THE GOTTFRIED
CORPORATION, AND ENVIRONMENTAL ABATEMENT SERVICES, INC.

---

### SECOND AMENDED AND SUPPLEMENTAL PETITION FOR DAMAGES

NOW INTO COURT, through undersigned counsel, come Petitioners, Tarsia Williams

and Breck Williams ("Petitioners"), the only children of the original Petitioner, Frank Williams,

Jr., who have been substituted in his place in this litigation, individually and on behalf of Frank

Williams, Jr. pursuant to the Honorable Court's order (Doc. No. 73), and file this Second

Amended and Supplemental Petition for Damages, with respect, and represent as follows:

1.

Petitioners are persons of the full age of majority and residents of the Parish of Orleans,

State of Louisiana.

**EXHIBIT B**

2.

Petitioners are the only children of Frank Williams, Jr., the original Petitioner in this action pursuant to a Petition for Damages filed in the Civil District Court for the Parish of Orleans on November 11, 2008 ("Original Petition").

3.

Venue is proper in Orleans Parish under Articles 42 and 74 of the Louisiana Code of Civil Procedure, as at least one of the defendants has a registered office in this parish and the wrongful conduct occurred in Orleans Parish.

4.

Defendant Lockheed Martin Corporation removed the Original Petition to the United States District Court for the Eastern District of Louisiana on January 8, 2009. The removal was purportedly based on federal officer jurisdiction. The case was allotted Docket No. 09-00065.

5.

Frank Williams timely filed a motion to remand the case to state court on February 6, 2009 (Doc. No. 10), on the grounds that federal officer jurisdiction does not exist.

6.

Prior to a ruling on the motion, the case was transferred and consolidated with the In Re: Asbestos Products Liability Litigation (Vol. VI) under MDL No. 875 pursuant to the transfer order issued by the United States Judicial Panel on Multidistrict Litigation on June 2, 2009.

7.

Frank Williams re-filed the motion to remand with this Honorable Court on May 13, 2010 (Doc. No. 10). The motion was denied on April 9, 2012 (Doc. No. 69).

8.

On June 2, 2010, Petitioners notified the Court and the parties that Frank Williams had passed away by filing the Administrative Order No. 12 Submissions (Doc. No. 12). Petitioners subsequently moved to be substituted as parties-plaintiff in Frank Williams' place so that they could properly assert his claims, as well as their own, in this litigation on February 17, 2011 (Doc. No. 34). The Honorable Court granted the motion on May 7, 2012 (Doc. No. 73).

9.

Petitioners continue to maintain that removal to federal court was improper and that federal jurisdiction does not exist. Petitioners do not waive, and expressly reserve, the right to seek transfer and remand to state court once additional discovery is completed regarding the lack of subject matter jurisdiction.

10.

Made defendants herein are the following:

a. **LOCKHEED MARTIN CORPORATION**, individually and as successor-in-interest to **MARTIN MARIETTA, INC.**, a Maryland corporation with its principal place of business in the State of Maryland and authorized to do and doing business in the State of Louisiana.

b. **OWENS-ILLINOIS, INC.**, an Ohio corporation with its principal place of business in the State of Ohio and authorized to do and doing business in the State of Louisiana.

c. **CBS CORPORATION**, formerly known as and/or as successor-by-merger to **VIACOM, INC.**, formerly known as and/or as successor-in-interest to **WESTINGHOUSE ELECTRIC CORPORATION**, a Pennsylvania corporation with its principal place of business in the State of New York and authorized to do and doing business in the State of Louisiana.

d. **FOSTER WHEELER CORPORATION**, a New York corporation with its principal place of business in the State of New Jersey and authorized to do and doing business in the State of Louisiana.

e. **GENERAL ELECTRIC COMPANY**, a New York corporation with its principal place of business in the State of Connecticut and authorized to do and doing business in the State of Louisiana.

f. **UNIROYAL, INC.**, a New Jersey corporation with its principal place of business in the State of Connecticut and authorized to do and doing business in the State of Louisiana.

g. **THE McCARTY CORPORATION**, a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of East Baton Rouge, State of Louisiana.

h. **EAGLE, INC.**, formerly known as **EAGLE ASBESTOS & PACKING COMPANY, INC.**, a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of Orleans, State of Louisiana.

i. **TAYLOR-SEIDENBACH, INC.**, a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of Orleans, State of Louisiana.

j. **REILLY-BENTON COMPANY, INC.**, a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of East Baton Rouge, State of Louisiana.

k. **CSR, LTD.**, a foreign corporation with its principal place of business in Chatswood, NSW, Australia, and which may be served through the Hague Convention at 9 Help Street, Chatswood, NSW 2067, Australia.

l. **ADVOCATE MINES, LTD.**, a foreign corporation with its principal place of business in Canada, and which may be served through the Hague Convention through Winn Oughtred at Border, Ladner & Gervais, LLP, 40 King Street West, Suite 4100, Toronto, Canada M5H 3Y4.

m. **THE BOEING COMPANY**, a Delaware corporation with its principal place of business in the State of Illinois and registered to do and doing business in the State of Louisiana, and which may be served through Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802.

n. **SEVILLE, INC.**, formerly known as **BRANTON INSULATIONS, INC.**, a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of Jefferson, State of Louisiana, and which may be served through Gary M. Zwain, 3838 N. Causeway Boulevard, Lakeway Three, Suite 2900, Metairie, Louisiana 70002.

- 4 -

o. **STANDARD SERVICES COMPANY, INC.,** formerly known as **STANDARD SUPPLY & HARDWARE COMPANY, INC.,** a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of St. Charles, State of Louisiana, and which may be served through E. M. Hadden, 14694 Airline Highway, Destrehan, Louisiana 70047.

p. **AIR PRODUCTS & CHEMICALS, INC.,** a Delaware corporation with its principal place of business in the State of Pennsylvania and authorized to do and doing business in the State of Louisiana, and which may be served through C.T. Corporation System, 5615 Corporate Boulevard, Suite 400B, Baton Rouge, Louisiana 70808.

q. **EXXON MOBIL CORPORATION,** formerly known as **EXXON CORPORATION,** a New Jersey corporation with its principal place of business in the State of Texas and authorized to do and doing business in the State of Louisiana, and which may be served through Corporation Service Company, 320 Somerulos Street, Baton Rouge, Louisiana 70802.

r. **NEW NGC, INC.,** formerly known as **NATIONAL GYPSUM COMPANY,** a Delaware corporation with its principal place of business in the State of North Carolina and authorized to do and doing business in the State of Louisiana, and which may be served through The Prentice-Hall Corporation System, Inc., 320 Somerulos Street, Baton Rouge, Louisiana 70802.

s. **INSULATION TECHNOLOGIES, INC.,** a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of Jefferson, State of Louisiana, and which may be served through Michael D. Peytavin, 401 Whitney Avenue, Suite 500, Gretna, Louisiana 70056.

t. **HY-TECH ROOFING SERVICES, INC.,** a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of St. Charles, State of Louisiana, and which may be served through Lester J. Haydel, Jr., 14 Rosedown Drive, Destrehan, Louisiana 70047.

u. **LOU-CON, INC.,** a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of St. Bernard, State of Louisiana, and which may be served through Michael R. Carson, 3100 East St. Bernard Highway, Meraux, Louisiana 70075.

v. **THE GOTTFRIED CORPORATION,** a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of St. Tammany, State of Louisiana, and which may be served through Karl Gottfried, III, 6 Meyers Road, Covington, Louisiana 70435.

**w. ENVIRONMENTAL ABATEMENT SERVICES, INC.**, also known as **EASI**, a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of East Baton Rouge, State of Louisiana, and which may be served through R. Gray Sexton, 8675 Bluebonnet Boulevard, Suite C, Baton Rouge, Louisiana 70810.

Reference in this pleading to any of the foregoing named defendants includes any and all parent companies, predecessors- or successors-in-interest, subsidiaries, mergers, joint ventures, and/or affiliated companies.

11.

Defendants Lockheed Martin Corporation (formerly known as Martin Marietta, Inc.), Owens-Illinois, Inc., CBS Corporation (formerly known as and/or as successor-by-merger to Viacom, Inc., formerly known as and/or as successor-in-interest to Westinghouse Electric Corporation), Foster Wheeler Corporation, General Electric Company, Uniroyal, Inc., The Boeing Company, Air Products & Chemicals, Inc., Exxon Mobil Corporation (formerly known as Exxon Corporation), and New NGC, Inc. (formerly known as National Gypsum Company) are corporations incorporated under the laws of states other than Louisiana. These defendants all have their principal place of business in states other than Louisiana, as well as some foreign countries.

12.

Defendants Eagle, Inc. (formerly known as Eagle Asbestos & Packing Company, Inc.) and Taylor-Seidenbach, Inc. are Louisiana corporations with their principal place of business in the State of Louisiana and their registered offices in the Parish of Orleans, State of Louisiana.

13.

Defendants The McCarty Corporation, Reilly-Benton Company, Inc., and Environmental Abatement Services, Inc. (also known as EASI) are Louisiana corporations with their principal

- 6 -

place of business in the State of Louisiana and their registered offices in the Parish of East Baton Rouge, State of Louisiana.

14.

Defendants Seville, Inc. (formerly known as Branton Insulations, Inc.) and Insulation Technologies, Inc. are Louisiana corporations with their principal place of business in the State of Louisiana and their registered offices in the Parish of Jefferson, State of Louisiana.

15.

Defendants Standard Services Company, Inc. (formerly known as Standard Supply & Hardware Company, Inc.) and Hy-Tech Roofing Services, Inc. are Louisiana corporations with their principal place of business in the State of Louisiana and their registered offices in the Parish of St. Charles, State of Louisiana.

16.

Defendant Lou-Con, Inc. is a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of St. Bernard, State of Louisiana.

17.

Defendant The Gottfried Corporation is a Louisiana corporation with its principal place of business in the State of Louisiana and its registered office in the Parish of St. Tammany, State of Louisiana.

18.

Defendant CSR, Ltd. is a corporation organized under the laws of Australia with its principal place of business in Australia.

19.

Defendant Advocate Mines, Ltd. is a corporation organized under the laws of Canada with its principal place of business in Canada.

20.

Upon information and belief, The Boeing Company ("Boeing") and/or its predecessors-in-interest entered into a lease agreement with the National Aeronautics and Space Agency ("NASA") for the use and maintenance of the NASA Michoud Assembly Facility located in New Orleans, Louisiana. Boeing occupied and maintained the facility in the 1960s and 1970s.

21.

Upon information and belief, Lockheed Martin Corporation and/or its predecessors-in-interest, including Martin Marietta, Inc. (collectively "Lockheed"), entered into a lease agreement with NASA for the use and maintenance of the NASA Michoud Assembly Facility in the 1970s. Lockheed occupied and maintained the facility until 2009.

22.

The NASA Michoud Assembly Facility was used by NASA and its contractors for the construction of the external fuel tanks for the space shuttle program. However, the facility was also used for a variety of other purposes over the decades, including civilian and private projects.

23.

Upon information and belief, Boeing and Lockheed entered into agreements with NASA to perform work on the external fuel tanks, as well as civilian and private projects unrelated to the federal government. These agreements included the obligation to maintain the NASA Michoud Assembly Facility and to oversee the construction of new buildings and the reconstruction, refurbishment, and repairs to existing buildings.

24.

Over many decades, Boeing and Lockheed performed numerous construction, reconstruction, repairs, and other building projects at the NASA Michoud Assembly Facility, many of which included the installation or use of asbestos-containing materials ("ACM").

Upon information and belief, Boeing and Lockheed purchased, installed, and/or used asbestos and/or ACM at the NASA Michoud Assembly Facility that was sold, manufactured, supplied, distributed, disseminated, installed, removed, disposed of, and/or otherwise used by Owens-Illinois, Inc., CBS Corporation, Foster Wheeler Corporation, General Electric Company, Uniroyal, Inc., The McCarty Corporation, Eagle, Inc., Taylor-Seidenbach, Inc., Reilly-Benton Company, Inc., CSR, Ltd., Advocate Mines, Ltd., Seville, Inc., Standard Services Company, Inc., Air Products & Chemicals, Inc., Exxon Mobil Corporation, New NGC, Inc., Insulation Technologies, Inc., Hy-Tech Roofing Services, Inc., Lou-Con, Inc., The Gottfried Corporation, Environmental Abatement Services, Inc., and/or their predecessors-in-interest, subsidiaries, mergers, joint ventures, and/or affiliated companies.

26.

Frank Williams initially worked at the NASA Michoud Assembly Facility from approximately 1966 through 1968.

27.

From 1974 through 1993, Frank Williams was employed at the NASA Michoud Assembly Facility as a mechanical engineer by Lockheed.

28.

During Frank Williams' employment with Lockheed, he worked primarily in an office building at the NASA Michoud Assembly Facility. The office environment in which he worked contained asbestos and ACM that was installed by, at the direction of, or on behalf of Boeing and/or Lockheed. At all relevant times during his work at the NASA Michoud Assembly Facility, Frank Williams was exposed to dangerously high levels of asbestos and ACM in the normal, routine course of his work on a daily basis from 1966-1968 and 1974-1993.

29.

As a result of exposure to asbestos for approximately 23 years caused by the tortious conduct of the named defendants, Frank Williams contracted mesothelioma and other related ill health effects, with which he was first diagnosed on approximately August 25, 2008. Frank Williams died from his disease on January 1, 2009.

30.

Frank Williams' mesothelioma was caused by injuries and damages to his person that he received from his substantial occupational exposure to asbestos during his employment. The internal injuries Frank Williams sustained from his exposure to asbestos dust caused injuries and damages to his person starting in 1966 and continuing until his death. Frank Williams' mesothelioma was caused by injurious exposure to asbestos dust and damages he received from that exposure. Frank Williams' diagnosis of mesothelioma is directly attributable to his exposure to asbestos fibers for approximately 23 years, and those initial injuries and damages caused by that exposure. Medical studies suggest that Frank Williams began to sustain tissue damage shortly after his inhalation of asbestos fibers and that he sustained distinct bodily injury in each year of his occupational exposure to asbestos dust.

31.

The McCarty Corporation, Eagle, Inc., Reilly-Benton Company, Taylor-Seidenbach, Inc., Seville, Inc., Standard Services Company, Inc., Air Products & Chemicals, Inc., Hy-Tech Roofing Services, Lou-Con, Inc., and The Gottfried Corporation manufactured, sold, distributed, and/or installed asbestos-containing pipe covering, insulation, blankets, special fittings, gaskets blocks, valves, cements, mastics, jackets, roofing, and other materials and products at the NASA Michoud Assembly Facility at various times prior to and throughout the period of Frank Williams' exposure. In addition, these defendants distributed asbestos-containing products

manufactured, distributed, and sold by other asbestos material manufacturers and held those products out as their own, thus making them liable as the manufacturers under Louisiana law.

32.

The McCarty Corporation, Eagle, Inc., Reilly-Benton Company, Inc., Taylor-Seidenbach, Inc., Seville, Inc., Standard Services Company, Inc., Air Products & Chemicals, Inc., Hy-Tech Roofing Services, Insulation Technologies, Inc., Lou-Con, Inc., The Gottfried Corporation, and Environmental Abatement Services, Inc. also performed construction, renovation, repairs, asbestos removal, and/or abatement work at locations where Frank Williams was working, thereby exposing him to asbestos-containing products, which caused and/or contributed to his mesothelioma.

33.

Owens-Illinois, Inc. (pipe and boiler insulation), CBS Corporation (block and boiler insulation, electrical component insulation), Foster-Wheeler Corporation (block and boiler insulation), General Electric (block and boiler insulation, electrical component insulation), Uniroyal, Inc. (asbestos blankets, mats, and other asbestos-containing products), Exxon Mobil Corporation (asphalt containing asbestos and other asbestos-containing products), and New NGC, Inc. (wallboard, plaster, acoustical ceiling tiles, rock wool, and other asbestos-containing products) manufactured, distributed, and/or placed into commerce various ACM.

34.

Insulation Technologies, Inc. and Environmental Abatement Services, Inc. performed asbestos abatement, removal, and disposal work at the NASA Michoud Facility during the period of Frank Williams' employment.

35.

The named defendants in this Second Amended and Supplemental Petition for Damages are referred to collectively herein as the "Asbestos Defendants."

36.

Frank Williams was exposed to asbestos-containing products or materials sold, manufactured, supplied, distributed, disseminated, installed, removed, disposed of, and/or otherwise used by the Asbestos Defendants during his employment.

37.

As a result of the defective and unreasonably dangerous condition and composition of the asbestos-containing products sold, manufactured, supplied, distributed, disseminated, installed, removed, disposed of, and/or otherwise used by the Asbestos Defendants, Frank Williams inhaled asbestos fibers and other harmful substances emitted during the normal use of said products, proximately causing the mesothelioma and other related ill health effects. Petitioners further contend that the Asbestos Defendants are liable as a result of selling, manufacturing, supplying, distributing, disseminating, installing, removing, disposing of, or otherwise using an unreasonably dangerous per se product, a product defective in design, for breach of warranty, and for failing to provide adequate warnings and instructions. Further, the Asbestos Defendants are liable for failing to substitute available alternative products and for fraudulently concealing the dangers of their products and the health hazards associated with the use and exposure to said products.

38.

As a result of the aforementioned acts of negligence, intentional tort, fraud, strict liability, and absolute liability of the Asbestos Defendants, Frank Williams contracted mesothelioma and other related ill health effects that led to his death on January 1, 2009.

39.

The asbestos-containing products manufactured, distributed, and/or sold by the Asbestos Defendants were unreasonably dangerous per se, were defective in design, and constituted a breach of warranty from said manufacturers. Further, the Asbestos Defendants failed and refused to warn Frank Williams and/or his employers of the danger of exposure to such products. The Asbestos Defendants also failed to warn of the invisible nature of the asbestos and that it could cause diseases such as mesothelioma, asbestosis, pleural plaques, pleural thickening, and cancer.

40.

Prior to the time Frank Williams was exposed to asbestos, the Asbestos Defendants were aware of the health hazards associated with exposure to asbestos, including, but not limited to, asbestos related mesothelioma, pulmonary disease, pleural plaques, pleural thickening, fibroses, asbestosis, and cancer. Further, the Asbestos Defendants were aware or should have been aware that invisible asbestos particles could remain airborne for many hours and that exposure could occur even after actual use of the products ceased; nevertheless, the Asbestos Defendants remained silent as to the unreasonably dangerous nature of the products which suppression of the truth was made with the intention of obtaining an unjust advantage over unsuspecting victims.

41.

The Asbestos Defendants made the misrepresentations despite their knowledge of the falsity, and fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intention to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

- 13 -

42.

As a result of the misrepresentations of the Asbestos Defendants that asbestos-containing products were safe, nontoxic, fully tested, desirable, and suitable for use, and as a result of the Asbestos Defendants' suppression of the truth about the health hazards associated with exposure to said product, Frank Williams was exposed to products manufactured, distributed, and sold by the Asbestos Defendants, and he contracted asbestos-related mesothelioma and other related ill-health effects.

43.

The misrepresentation and suppression of the truth of occupational health hazards were made by the Asbestos Defendants with the intent of obtaining an unjust advantage over Frank Williams and other employees and their family members who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their exposure to asbestos. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees and their family members so that they would not associate any lung disease with occupational exposure from their job. As a result of these misrepresentations and suppressions, the Asbestos Defendants sought to prevent or limit occupational disease claims by injured employees who contracted disease. These actions constitute fraud under Louisiana law.

44.

The health hazards of asbestos have been recognized by those in the business for two thousand years. The Greek geographer Strabo and the Roman historian Pliny the Elder both recognized asbestosis in slaves whose task was to weave asbestos into cloth. There is conclusive evidence (more specifically outlined below) that by the end of the 1930s, it was widely known in the United States by those in the industry and their insurers that exposure to asbestos could cause asbestosis and cancer, that asbestosis was a fatal disease, and that the latency period of asbestosis

related disease was of many years duration subsequent to initial exposure, yet this knowledge was suppressed from workers like Frank Williams.

45.

By the time Frank Williams began working with and around asbestos products, virtually every state in the United States recognized asbestos as a compensable claim under workers' compensation laws. In fact, the Louisiana legislature in 1952, when it enacted its first Workers' Compensation Occupational Disease Act, listed asbestosis as a compensable occupational disease. Moreover, all suppliers (as well as independent contractors) to any company with federal government contracts were bound to comply with health and safety requirements of the Walsh Healy Public Contract Act first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. They also required isolation of dusty work, ventilation, use of respirators, and medical examination by doctors. Despite this, Frank Williams and other similarly situated workers were never warned of any hazard associated with asbestos, were never protected by use of adequate ventilation, were required to work with asbestos and around others using asbestos products, and were required to pick up asbestos containing debris. They never saw a warning on any asbestos product nor were they warned by any defendant about any hazard associated with exposure to asbestos products. Despite the fact that the Asbestos Defendants were aware of the hazards of asbestos to which Frank Williams was exposed, they failed and refused to warn of these dangers and, furthermore, concealed these hazards. Moreover, the Asbestos Defendants suppressed and prevented the dissemination of information relating to the hazards of asbestos and silica exposure, thus constituting fraud under Louisiana law. Even after OSHA became law in 1971, Frank Williams was not warned of the health hazards associated with exposure to asbestos.

46.

The acts of the Asbestos Defendants, as described above, constitute fraudulent misrepresentation and/or concealment, which proximately caused the injuries to Frank Williams in the following manner:

1) The materials published or caused to be published were false and incomplete and that the defendants knowingly and deliberately deleted references to the known health hazards of asbestos and asbestos-related products;

2) The defendants intended the publication of false and misleading reports and/or the non-disclosure of documented reports of the health hazards of asbestos:

a) To maintain a favorable atmosphere for the continued sale, distribution, and use of asbestos-related products;

b) To assist in the continued pecuniary gain of the defendants through the sale of asbestos products to an ignorant public;

c) To influence in the defendant's favor, legislation to regulate asbestos exposure and to limit medical and disability claims for compensation;

d) To provide a defense against lawsuits brought for injury resulting from asbestos disease;

e) To prevent relevant medical inquiry about asbestos disease;

f) To mislead the general public and Frank Williams about the hazards associated with asbestos products; and

g) To induce Frank Williams, his employers, and his clients to use asbestos products;

3) Defendants were in a position of superior knowledge regarding the health hazards of asbestos and therefore Frank Williams and others deciding to use the said asbestos containing products to which Frank Williams was exposed, had a right to rely on the published reports commissioned by the defendants regarding the health hazards of asbestos and the absence of published medical and scientific data regarding the hazards of asbestos and asbestos related products.

Insurance premiums were set based on the risks posed by the insured. Insurance companies discussed the hazards of asbestos with insureds that manufactured, used, or distributed asbestos products. Insurance field inspectors would survey the premises or operations of the insured, advise the insured of the hazard, and set the premium accordingly. This was true prior to the time that Frank Williams was first exposed to asbestos and continued throughout his employment. The fact that workers' compensation insurance carriers were concerned about asbestos is evidenced by the 1932 occupational disease report in "The National Underwriter" where asbestos was listed as a serious hazard receiving special attention "for some time" in insurance underwriting. When the Supreme Court of North Carolina (*McNeely v. Carolina Asbestos Co.*, May 23, 1934) determined that asbestosis was compensable under its workers' compensation law, insurance executive F. R. Jones wrote that the *McNeely* case and others like it injected elements of uncertainty that rendered the hazards of asbestosis "often uninsurable at practicable rates"; he wrote that even though rates for those in the asbestos business were high, "their adequacy... is generally doubted." To avoid losing money, insurance companies instituted a practice of servicing claims as well as providing the insurance – "sort of a right pocket to left pocket ... in other words there wasn't any way (insurance companies) could lose money on it." (See deposition of Harry J. Flynn in *Bradley v. Todd Shipyards, Inc.*, No. 85-05657, Div. "D", Civil District Court for the Parish of Orleans.)

48.

That the Asbestos Defendants and the companies that insured them knew of the health hazards associated with exposure to asbestos since the 1930s (and suppressed this information) has been shown by numerous documents and testimony in asbestos-related cases throughout the United States. In fact, the knowledge was so well recognized in the asbestos industry that the

insurance industry considered confessing liability; instead, they decided to make it "economically impossible" for injured workers to pursue their claims. The minutes of meetings in 1976 and 1977 of American Mutual Insurance Alliance (an insurance industry association) confirm that the hazards of asbestos exposure have been known for many years. These minutes specifically state that medical research in 1900 linked asbestos with asbestosis and by 1935 it was recognized that asbestos caused cancer. In a memorandum of a meeting of a discussion group dated April 21, 1977, it was stated: "The meeting closed with a unanimous rejection of a suggestion that liability in asbestos cases be admitted and the carriers agreed between themselves as to their respective losses and expenses." That insurance companies and their insureds were working together to discourage valid claims is also demonstrated in earlier memos. In minutes dated May 22, 1974, discussing *Borel v. Fibreboard Paper Products Corp.*, 493 F.2d 1076 (5th Cir. 1973), *cert. denied*, 419 U.S. 869 (1974), it is stated: "The appeals court decision in the Borel case of course sets a very bad precedence for our other pending asbestosis cases and (sic) in this jurisdiction we will soon have to formulate a '**game plan**' for the continued defense of these asbestos cases **with the other defendants.**" (Emphasis added.) In a memo dated October 22, 1974, it was decided that the asbestos defendants and their insurance companies would resist pending cases "and attempt to make this economically (sic) impossible for the Petitioners to pursue the other cases." These attempts to prevent and stifle valid claims show that the Asbestos Defendants, to this day, are committing fraud.

49.

Documents and testimony of the Asbestos Defendants as well as associated asbestos companies is replete with the fact of knowledge and fraud. Although Johns-Manville (hereinafter sometimes referred to as "J-M") and Raybestos-Manhattan, Inc. (hereinafter sometimes referred to as "R-M") are not defendants herein, a discussion of their knowledge is

- 18 -

necessary to show knowledge within asbestos industry associations, within the insurance industry, and among other defendants. In 1929, Johns-Manville Corporation and Raybestos-Manhattan, Inc. agreed to permit the Metropolitan Life Insurance Company to conduct a complete Industrial Hygiene survey of some of their facilities, including J-M's asbestos mines and mills in the Province of Quebec. The initial investigation began in October 1929 and was completed in January 1931. The study included the following: a survey of the dust conditions in the asbestos mines, mills and fabricating plants; physical examinations of asbestos workers, including X-ray films; and a study of the dust exhaust systems designed to eliminate asbestos dust. This survey was supervised by Dr. Anthony J. Lanza, Assistant Medical Director of Metropolitan; Dr. William J. McConnell, Assistant Medical Director of Metropolitan; and J. William Fehnel, a chemist with Metropolitan. Subsequent to this initial study, meetings were held among Dr. Anthony J. Lanza, W. R. Seigle (Vice-President of J-M), Vandiver Brown (General Counsel for J-M), S. A. Williams (President of Johns-Manville Products Corporation), and Sumner Simpson (President of Raybestos-Manhattan, Inc.). The minutes of these meetings that occurred in November 1933 through January 1934 reflected that Metropolitan Life was desirous of conducting a follow-up study of the J-M and R-M facilities, as well as expanding the scope of the study to include additional J-M facilities and facilities of other members of the asbestos industry. Dr. Lanza felt that the Metropolitan Life Insurance Company should advise the companies of the types of respirators that should be provided to the employees engaged in making a study of this problem. On December 7, 1934, Dr. Lanza forwarded to Vandiver Brown, counsel for J-M, the "galley proof" of the results of the 1929 through 1931 survey of the R-M and J-M plants, entitled "Effects of Inhalation of Asbestos Dust on the Lungs of Asbestos Workers." This "draft" was also circulated to representatives of Raybestos-Manhattan, who prepared editorial comments and recommendations for Dr. Lanza concerning the final

- 19 -

publication of the report. Johns-Manville prepared similar comments. The Metropolitan report informed Raybestos-Manhattan and Johns-Manville of the following: that prolonged exposure to asbestos dust cause pulmonary fibrosis; that asbestosis could cause cardiac enlargement; that it was possible for uncomplicated asbestosis to have fatal results; and that the amount of dust in the air in the asbestos plants surveyed could be substantially reduced. After incorporating some of J-M's and R-M's editorial suggestions, Dr. Lanza published "Effects of the Inhalation of Asbestos Dust on the Lungs of Asbestos Workers" in the Public Health Reports, Volume 59, No. 1, January 4, 1935.

50.

In November 1936, Vandiver Brown of Johns-Manville, together with Sumner Simpson, President of Raybestos-Manhattan, solicited other members of the Asbestos Products Industry to participate in "asbestos dust experiments" by the Saranac Laboratory of the Trudeau Institute. Dr. Leroy U. Gardner was the director of the Trudeau Foundation at the time. A report of these works was prepared by Dr. Gardner on April 18, 1938. The report was sent to Vandiver Brown, who in turn sent it to Dr. Lanza for his comment.

51.

In 1942, Charles Roemer, a New Jersey attorney, was advised by his cousin, Dr. Jacob Roemer, that in the course of reviewing chest x-rays of employees at the Union Asbestos and Rubber Company's Patterson, New Jersey plant, he had observed a significant number with lung changes which he believed were due to asbestos exposure. Dr. Roemer advised that the men be informed of his findings and that they be instructed to secure outdoor employment, which did not involve any exposure to asbestos dust. Dr. Roemer said that unless this was done immediately, the men would suffer and die from asbestos-related lung disease. Vandiver Brown acknowledged that J-M's physical examination program had produced similar findings of x-ray

- 20 -

evidence of asbestos disease among workers, but told Frank Roemer and the UNARCO representatives that it was foolish to be concerned. Frank Brown explained that it was J-M's policy to let its employees die of asbestos poisoning rather than inform them of health consequences which would undoubtedly lead to costly lawsuits against the company. As testified to by Frank Roemer, "I'll never forget, I turned to Frank Brown ... and I said, 'Frank Brown, do you mean to tell me you would let them work until they drop dead?' He said, 'Yes. We save a lot of money that way.'" (Deposition Charles H. Roemer taken April 25, 1984, *Johns-Manville Corp. v. United States*, U.S. Claim Court, Civ. No. 465-83C.)

52.

The "Air Hygiene Foundation" was established in 1935 as a fellowship within the Mellon Institute (then a part of the University of Pittsburg). The organizations' name was changed to "Industrial Hygiene Foundation" ("IHF") and, in 1968, it was again changed to the "Industrial Health Foundation." J-M joined in 1936. Other IHF members included, among others, Flintkote, Garlock, and Westinghouse Electric Corporation or their predecessors-in-interest. The IHF was founded to conduct occupational health research, particularly with respect to the health effects of dust in the work place. One of the functions of the IHF was to gather and disseminate information regarding occupational health to its members. Since its inception, it has published special bulletins on items of general interest under the headings of legal bulletins, medical bulletins, management bulletins, and engineering bulletins. Since 1937, member companies have been kept informed on occupational health issues by the Industrial Hygiene Digest, a monthly publication which is sent to all members in return for their annual membership fee. The Digest is a compilation of abstracts, grouped by topic, of the published domestic and foreign scientific and medical literature pertaining to industrial health and hygiene. In addition to scientific abstracts, the Digest includes a section on legal developments and also provides notice

of any proposed changes in threshold limit values for various substances. Correspondence between members and the IHF established that members either participated in or knew of a number of studies and surveys dating as far back as the 1930s which linked asbestos with various lung diseases. As part of its consultative services for its members, the IHF undertook a number of studies involving evaluations of asbestos dust conditions and asbestos-related disease. In June 1947, the fruits of the industry survey conducted by the IHF for the ATI and its members were published in a "Report of Preliminary Dust Survey for Asbestos Textile Institute." The object of the investigation was stated as: "defining the specific nature and the magnitude of the (asbestosis) problem in all its phases ... An original objective of most immediate importance was to facilitate the exchange of information between the member companies on successful methods of dust control and otherwise to promote a general improvement in that field." The preliminary survey was divided into three parts designated as "Engineering, Medical and Physical Testing" and was based on visits made to member companies' plants over a three-month period. Minutes of Air Hygiene Committee meetings throughout the 1940s and 1950s reflect frequent discussions and presentations pertaining to appropriate medical practices and industrial hygiene approaches to the problem of asbestos dust in the work place. It was continually stressed that both pre-employment and periodic follow-up medical examinations were essential to monitor the health of employees, the necessity of x-rays and lung function studies, and the proper requisites for a diagnosis of asbestos-related disease. Some annual meetings apparently were held by the IHF. The minutes for the Fifth Annual Meeting of the Air Hygiene Foundation of America, Inc., which was held on November 12 and 13, 1940, revealed asbestos to be one of its two main topics of interest. An Interim Report of the Preventive Engineering Committee, written by Philip Drinker, discussed *inter alia* dust particle size and dust control. A second report by Foundation Research at the Saranac Laboratory entitled "Individually Susceptibility to Toxic Dusts,"

authored by Dr. Leroy Gardner, dealt primarily with the problems of silica dust. Also discussed were court decisions on workers' compensation cases. In a case involving the death of a North Carolina man that was discussed, the minutes indicated that the claimant sought compensation on grounds that his pneumonia was due to asbestosis. The Supreme Court of North Carolina upheld the award finding that asbestosis was a contributing cause of death. The Air Hygiene Foundation also recommended that pre-employment and periodic chest x-rays be conducted by a reputable radiologist, that the use of the Greenberg-Smith Midget Impinger be adopted for testing the levels of dust in the air, and that various procedures be implemented to reduce the dust in manufacturing facilities. In December 1946, Frank Hemeon of the Industrial Hygiene Foundation was invited to attend a meeting of the American Textile Institute (discussed *infra*) to respond to inquiries regarding IHF's proposed Industrial Hygiene Survey of the member companies. It was agreed at the February 5, 1947 meeting of the American Textile Institute (ATI) that the IHF be permitted to conduct its proposed survey. A June 18, 1947 report by W.C.L. Hemeon, Head Engineer for IHF, stated that the medical review reflected an incidence of asbestosis ranging between 3% and 20%. In one presentation at a regular meeting (prior to 1950) of the IHF, the suggested threshold limit value was criticized as being unsafe for persons exposed to asbestos fiber. The Asbestos Defendants thus had direct and actual knowledge that the suggested threshold limit value for asbestos was not safe. In addition, this criticism was published in the scientific literature and all defendants were put on notice of the hazards of the suggested threshold limit value.

53.

In addition to the IHF, there were other trade associations that were formed to aid and service companies in the asbestos industry. Members of the ATI, founded on November 16, 1944, included companies which produced asbestos-containing cloth. At the June 13, 1946

- 23 -

meeting of the ATI, a question was posed as to whether or not a committee should be formed to deal with the question of dust control. Beginning on June 13, 1946, a subcommittee of the dust control committee of the ATI recommended that the committee contact the United States government, the state governments in which member plants were located, the Mellon Institute, and Metropolitan Life for the purpose of preparing a tentative program aimed at bringing to member companies the assistance of qualified technical and medical people. In 1946, ATI was presented with a plan for a central medical committee which would call for individual medical programs at all facilities using asbestos as well as a central medical department which would be responsible to the association. Recommendations for initial medical examinations and periodic follow-up examinations were also made.    The recommendation for periodic medical examinations was characterized by the presenting doctor as "fundamental in an industry where there was a 'known occupational health hazard.'" While the ATI considered this proposal, it nonetheless elected to defer the plan. During the late 1940s and early 1950s, the ATI was presented with a number of other plans for wide-ranging research on various issues dealing with asbestos-related disease in the asbestos industry. However, in some instances, the research projects and proposals were discarded.

54.

Sumner Simpson, the first Raybestos-Manhattan, Inc. President, maintained a file or collection of documents, correspondence, and memoranda pertaining to the subjects of the health effects of asbestos, dust control, and dust levels. These documents clearly evidence knowledge, beginning in at least the 1930s, of dangers posed by exposure to asbestos and steps which could and should be taken to minimize the risk of asbestos-caused diseases. The "Sumner Simpson" documents, as a group, demonstrate the high level of awareness and early sophistication of the asbestos industry of knowledge that excessive exposure to asbestos over a prolonged period of

- 24 -

time could and would produce asbestos-related diseases. Numerous letters in the "Sumner Simpson" document collection refer to the fact that many states were adding asbestosis as a compensable disease and that Raybestos-Manhattan, Inc. was going to have to deal with that reality.

55.

Defendant Owens-Illinois (O-I) began the manufacture and sale of the asbestos containing product "Kaylo" in the 1940s. O-I's knowledge of the hazards posed by the inhalation of asbestos fiber released from Kaylo can be documented as far back as the early 1940s. Much of the evidence arises out of testing done of Kaylo at the Saranac Laboratory at Saranac Lake, New York. The following is a brief description of some of the evidence pertaining to O-I's knowledge of the health hazards posed by inhalation of asbestos dust released from its Kaylo product. On February 12, 1943, O-I's director of research, U.E. Bows, sent a letter to L.U. Gardner of the Saranac Laboratory stating: "(The health hazard) should be considered from the standpoint of employees working in the plant where the material is made or where it may be sawed to the desired dimensions and also considered from the standpoint of applicators or erectors at the point of use." On November 16, 1948, A.J. Vorwald of the Saranac Laboratory sent a letter to U.E. Bows regarding the effects of inhalation of Kaylo dust in animal studies. This letter provides in pertinent part:

> In all animals sacrificed after more than 30 months of exposure to Kaylo dust, unmistakable evidence of asbestosis has developed, showing that Kaylo on inhalation is capable of producing asbestos and must be regarded as a potentially hazardous material.

> \* \* \*

> I realize that our findings regarding Kaylo are less favorable than anticipated. However, since Kaylo is capable of producing asbestosis, it is better to discover it now in animals rather than later in industrial workers. Thus, the company, being forewarned,

would be in a better position to institute adequate control measures for safeguarding exposed employees and protecting its own interest.

Along with the November 16 letter of Vorwald was an interim report to the Owens-Illinois Glass Company regarding the ability of dust generated by Kaylo to cause lung disease. Pertinent portions of that report provide:

Kaylo is capable, on prolong inhalation of producing asbestosis in the lungs of guinea pigs and it should be handled industrially as a hazardous dust.

\* \* \*

The animals were exposed to atmospheric suspensions of Kaylo dust for 8 hours daily, 5 and ½ days a week throughout the experiment. The dust concentration which varied somewhat from time to time has averaged 116 particles per cubic foot of air over the entire course of the experiment to date.

\* \* \*

All nine animals sacrificed subsequent to 30 months in the present experiment…have developed true fibrosis of a type characteristic of the response of guinea pigs to asbestos.

While the lesions up to 30 months showed no fibrosis, certain aspects of them were compatible with a preliminary stage in the development of asbestosis. These aspects were masked by the inert type of reaction to the materials other than asbestos in the dust.

\* \* \*

Kaylo, because of its content of an appreciable amount of fibrous chrysotile, is capable of producing asbestosis and should be handled as a hazardous industrial dust.

The Saranac Laboratory report clearly informed O-I that the asbestos content in the air in certain parts of its plant were potentially hazardous to human health. The report further recommended respirators be used by workers loading Kaylo material into box cars. In the same report, O-I was also warned against reliance on compliance with government and industry

standards in order to completely protect against the possibility of occupational disease. On February 7, 1952, Vorwald sent a letter to W.G. Hazard enclosing the final report on "The Capacity of Inhaled Kaylo Dust to Injure the Lung." A copy of the report was sent to the O-I corporate medical director. The report states in pertinent part:

> Kaylo dust is capable of producing peribronchiolar fibrosis typical of asbestosis. The dust also has a slightly unfavorable influence upon a tuberculosis infection. Although extrapolation from animal to human experience is difficult, nevertheless, the results of the study indicate that every precaution should be taken to protect workers against inhaling the dust.

Despite the information made known to O-I concerning the ability of dust generated from its Kaylo product to cause asbestosis and other ailments, O-I actually drafted a pamphlet stating that Kaylo could be used without the danger of developing asbestosis. *See* December 12, 1950 letter from Willis G. Hazard to A.G. Vorwald; December 9, 1952 correspondence from C.W. Howard to George White. O-I continued to promote Kaylo as safe and "non-toxic." See advertisement in Petroleum Engineer, C-55 to C-62, April 1952, Hydros Calcium Silicate Heat Insulation. Other evidence of knowledge includes the fact that in May 1952, Willis Hazard of O-I attended the Seventh Saranac Symposium where considerable discussion of asbestosis and cancer took place.

On October 5, 1955, Hazard of O-I wrote concerning a report of Saranac Lake contained in Arch. Indust. Health, 12:348-360 (1955), entitled "Effect of Inhaled Commercial Hydrous Calcium Silicate Dust on Animal Tissues." The report was published by Dr. Scheepers of the Saranac Laboratory and contained some of the Saranac Laboratory's findings pertaining to Kaylo. The report was not shown to O-I officials prior to publication. In his October 5, 1955 correspondence, Hazard stated:

- 27 -

> We had felt (publication of the research) would be the proper
> procedure for the long run, even though the experiments did not
> show Kaylo to be lily-white. They showed to be specific, the
> Kaylo dust could cause asbestosis, an incurable lung condition; and
> they showed the dust could reactivate tuberculosis...

The name "Kaylo" and "O-I" appear nowhere in the article. It is completely anonymous.

The above aptly demonstrates that O-I possessed the requisite knowledge of the hazards posed by inhalation of asbestos fiber as far back as the 1940s. Despite that knowledge, O-I chose not to warn Frank Williams or others similarly situated of the hazards posed to their health by working with or near O-I's products. Further, O-I's suppression of known health hazards associated with exposure to its products constitutes fraud under Louisiana law.

56.

Owens-Corning Fiberglass Corporation's (OCF) knowledge of the hazards associated with inhalation of asbestos can also be dated back to the early 1930s. The following is a brief outline of some of the documentation clearly demonstrating that at all times relevant hereto, OCF knew of the dangers to health posed by the inhalation of asbestos fiber released from its products. OCF began operations as the manufacturer of fiberglass insulation, which at the time was a major competitor of asbestos-containing insulation materials. On January 20, 1931, the Legal and Patent Department of OCF writes to Gardner of Saranac Laboratories:

> It is indeed good news to hear that you do but feel you will
> encounter any evidence of an asbestos-like reaction since none of
> the (fiberglass) fiber reaches the interior of the lungs.

As a manufacturer of fiberglass insulation, OCF expended substantial effort and resources to espouse the benefits of using fiberglass instead of asbestos. One of the primary benefits OCF focused on was that fiberglass insulation did not pose dangers to health, unlike asbestos insulation products. In the 1950s, OCF became a major purchaser of "Kaylo," the asbestos-containing insulation manufactured by O-I. In 1958, OCF purchased the Kaylo business from O-

I and also became active in the insulation contracting business. In purchasing the Kaylo business from O-I, OCF received copies of the aforementioned Saranac studies pertaining to Kaylo insulation products. As a manufacturer and contractor involved in the insulation industry, OCF became fully aware of the health hazards associated with inhalation of asbestos fiber.

A May 23, 1941 memorandum to Harold Boeschenstein documents a meeting of OCF employees with union attorneys and consultant Bartley. Bartley had apparently expressed concern to OCF over the health effects of fiberglass, particularly respiratory dangers. The memorandum further describes a meeting with union representatives in which low workers compensation rates for fiberglass manufacturers are discussed and contrasted with rates for asbestos manufacturers. Also discussed are meetings at the American Industrial Hygiene Association. On June 16, 1941, E.C. Ames sent a memorandum to H. Borstein entitled "Investigation of Health Aspects of Fiberglass" authored by Dr. W.J. Siebert, discussing the research of Dr. Seibert, a pathologist working for the Asbestos Workers' Union. In his paper, Dr. Siebert questioned the inference raised in other reports that there was no health hazards posed by glass fibers because they were too large to get into the lungs. In 1941, OCF also circulated a brochure which mentioned a letter from a representative of Aetna Insurance Company, J. Hill, stating that workers' compensation insurance for fiberglass was less costly than coverage for asbestos. On September 8, 1941, OCF's legal departments ordered reprints of the asbestos industrial hygiene reports of Page, Bloomfield & Lanza. On January 7, 1942, Edward Ames of OCF sent memoranda to Boeschenstein and E.J. Marshall setting forth a plan to "take the offensive" in 1942, by going to the Asbestos Workers' Union with documentation on asbestosis. On December 27, 1942, Frank Ames of OCF sent a memorandum to C.E. Gregory stating: "In formulating our policy on admixtures with asbestos, we should keep on the alert because otherwise we will run the risk of smearing fiberglass with the hazards of exposure to

- 29 -

asbestos." On September 21, 1970, Kern sent a memorandum to Dr. Jon Konzen concerning "asbestos-labeling" aptly depicting OCF's attitude in affixing labels to its asbestos containing products:

> Reference is made to your memo of September 15, regarding the warning label that should appear on Kaylo. Are you saying we have this now? Naturally I would like to delay this requirement as long as possible. Please advise.

In addition to the foregoing, OCF was apprised of the dangers posed by asbestos as a result of workers' compensation claims and third party actions brought by insulation workers against OCF and its subsidiary contracting divisions. The above clearly demonstrated that OCF was fully apprised of the dangers associated with the use of its products and took no precaution to warn Frank Williams, or other similarly situated, of those dangers or how to safely use its products.

57.

Defendants Eagle, Inc., Reilly-Benton Company, Inc., and Taylor-Seidenbach, Inc. did contracting work as early as the 1940s. U.S. Navy vessels were being constructed at all of these times. Accordingly, Eagle, Inc., Reilly-Benton, Inc., and Taylor-Seidenbach, Inc. were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Moreover, these defendants, being asbestos insulation contractors, had to pay higher insurance premiums as a consequence thereof. Frank Williams was exposed to asbestos as a result of the products manufactured, distributed, and sold by these defendants, yet at no time was he protected from or warned of these hazards.

Even after OSHA became the law in 1971, Frank Williams was not advised of the hazards associated with exposure to asbestos. These defendants were aware of the hazards of asbestos but failed and/or refused to warn Frank Williams of the dangers. These defendants also concealed and/or suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law. *See* Deposition of Fred J. Schuber, Jr., May 31, 1990, pages 149-155, 176-179, and exhibits attached to the May 9, 1990 deposition of Frank Schuber; Deposition of Thomas R. Dimm, February 3, 1986, pages 65-66; Eagle's response, dated March 27, 1990, to Petitioner's interrogatory number 4 in the case of *Atzenhoffer, et al v. National Gypsum, Co., et al*, C.A. #89-894; and Act No. 532 (1952), amendments to the Louisiana Workers' Compensation Act.

58.

Since the early 1940s, defendants Foster Wheeler Corporation, CBS Corporation, General Electric, and their predecessors-in-interest were major manufacturers of boilers used in the construction of U.S. Navy vessels. Their position was derived through government contacts at a national level, and since that time throughout the time when Frank Williams was last exposed, they supplied boilers to virtually every shipyard constructing and repairing U.S. Navy vessels in the country. Accordingly, since the early 1940s, they were aware of the health and safety requirements of the Walsh Healey Public Contract Act, first promulgated in 1936, as well as the regulations of the U.S. Navy and U.S. Maritime Commission in 1943. These mandatory regulations addressed asbestos hazards and asbestosis as a resultant disease of exposure to asbestos. Despite this knowledge, at no time was Frank Williams advised of these hazards, as defendants failed and refused to warn Frank Williams of the dangers and, furthermore, concealed and suppressed their knowledge of these hazards, thus constituting fraud under Louisiana law.

59.

Defendants CBS Corporation, General Electric, and/or their predecessors-in-interest also manufactured, sold, distributed, or otherwise placed into commerce electrical components containing asbestos which Frank Williams was exposed throughout his career.

60.

Defendants CSR, Ltd. and Advocate Mines, Ltd. supplied raw asbestos fibers to various manufacturers, especially Johns-Manville, for use as a component and/or ingredient in the manufacture of asbestos-containing materials and insulation.

61.

The many tons of asbestos fibers sold by CSR, Ltd. and Advocate Mines, Ltd. and delivered to the New Orleans metropolitan area more than adequately fulfill the minimum requirements to trigger jurisdiction of the Louisiana and United States judicial system over these entities.

62.

Petitioners allege that it was CSR, Ltd.'s and Advocate Mines, Ltd.'s negligence that resulted in Frank Williams working with and inhaling dangerous asbestos fibers, especially including crocidolite fibers, produced by the products manufactured, supplied, and/or sold by other parties and/or non-parties named herein. CSR, Ltd. and Advocate Mines, Ltd. owed a duty to Frank Williams not to place a defective and unreasonably dangerous product into the stream of commerce. These entities breached their duty and the injuries Frank Williams suffered from were a direct and proximate result of the breach of that duty.

63.

As a result of CSR, Ltd.'s and Advocate Mines, Ltd.'s failure to warn that exposure to asbestos fibers was dangerous and/or fatal despite having knowledge of the same, Frank

Williams was unaware of any danger of exposure to CSR, Ltd.'s and Advocate Mines, Ltd.'s products and such failures on the part of these three entities caused, in part, the injuries of Frank Williams.

64.

CSR, Ltd. and Advocate Mines, Ltd. owed Frank Williams a duty to warn of known dangers associated with its products or of dangers reasonably foreseeable at the time the products were placed into the stream of commerce. These entities breached their duty in this regard, which breach ultimately resulted in Frank Williams' injuries and led to his untimely death. These entities were also negligent in failing to keep abreast of literature in the field as to the dangerous propensities of asbestos fibers and the products these fibers were incorporated into, especially crocidolite fibers. They failed to take reasonable means to discover the dangerous nature and propensities of these fibers, which acts and/or omissions were negligent and a proximate cause of the injuries of Frank Williams.

65.

The exposures experienced by Frank Williams were clearly foreseeable at the time CSR, Ltd. and Advocate Mines, Ltd. sold their asbestos fibers to asbestos-product manufacturers. CSR, Ltd. and Advocate Mines, Ltd. knew or should have known of the dangers of asbestos exposure to those such as Frank Williams, but they failed to prevent or minimize the exposures and totally failed and neglected to give any type of warning or alarm regarding the consequences of exposures to asbestos fibers.

66.

The asbestos fibers CSR, Ltd. and Advocate Mines, Ltd. sold to asbestos-containing product manufacturers and placed into the stream of commerce was defective and unreasonably dangerous at the time the fibers left their hands. CSR, Ltd. and Advocate Mines, Ltd. placed into

the stream of commerce a product that was inherently and unreasonably dangerous, which rendered the product and any product manufactured by their customers unreasonably dangerous and defective for failing to contain adequate warnings concerning reasonably foreseeable uses.

67.

CSR, Ltd., Advocate Mines, Ltd., and/or their predecessor or successor entities sold, supplied, furnished, shipped, or otherwise transported and/or caused the transport of asbestos fibers into and/or through the state of Louisiana for use in products manufactured in Louisiana. By and through this action, CSR, Ltd. and Advocate Mines, Ltd. availed themselves of the protections of Louisiana law and did business in this state. CSR, Ltd. and Advocate Mines, Ltd. entered into, completed, and/or performed contracts in the state of Louisiana and purposefully availed themselves of the laws of Louisiana.

68.

All of the Asbestos Defendants made the misrepresentations cited in the foregoing paragraphs despite their knowledge of the falsity, and the Asbestos Defendants fraudulently concealed and suppressed the truth about the dangerous nature of the products with the intent to induce purchasers to buy the products and innocent users and employees to continue to be exposed to same without concern for their health.

69.

As a result of the misrepresentations of the Asbestos Defendants that asbestos-containing products were safe, non-toxic, fully tested, desirable, and suitable for use, and as a result of the defendants' suppression of the truth about the health hazards associated with exposure to said products, Frank Williams was exposed to products sold, manufactured, supplied, distributed, disseminated, installed, removed, disposed of, and/or otherwise used by the Asbestos

Defendants, and he contracted asbestos related mesothelioma and other related ill health effects that ultimately resulted in his death.

70.

The misrepresentations and suppression of the truth of occupational health hazards were made by the Asbestos Defendants with the intent of obtaining an unjust advantage over Frank Williams (and other similarly situated employees) who remained uninformed and ignorant of the risks of contracting occupational lung diseases from their work environment. These misrepresentations and suppressions were calculated to produce the effect of misleading the employees so that they would not associate any lung disease with occupational exposures on the job. As a result of these misrepresentations and suppressions, all defendants sought to prevent or limit occupational disease claims by injured employees and claims from family members who also contracted disease. These actions constitute fraud under Louisiana law.

71.

The Asbestos Defendants had care, custody, and control of the asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injuries to and death of Frank Williams, and for which the Asbestos Defendants are strictly liable under Louisiana law.

72.

The Asbestos Defendants were the owners of asbestos, which asbestos was defective and which presented an unreasonable risk of harm, which asbestos resulted in the injury to and death of Frank Williams, and for which the Asbestos Defendants are strictly liable under Louisiana law.

- 35 -

73.

The Asbestos Defendants were involved in an ultra-hazardous activity in the handling of asbestos, which asbestos resulted in the injury to and death of Frank Williams, and for which the Asbestos Defendants are absolutely liable under Louisiana law.

74.

As a result of the aforementioned acts of negligence, intentional tort, fraud, strict liability, and absolute liability of all of the Asbestos Defendants, Frank Williams contracted asbestos-related mesothelioma and other related ill health effects that resulted in his death, for which the Asbestos Defendants are jointly, severally, and *in solido* liable.

75.

Defendants Boeing and Lockheed are also strictly liable as the owners and/or lessees of the NASA Michoud Assembly Facility where Frank Williams received significant exposures to asbestos fibers throughout his working career, as they had garde of the asbestos-containing materials at all relevant times herein.

76.

Alternatively, Boeing and Lockheed knew or should have known of the propensity of asbestos fibers to cause and/or contribute to the mesothelioma suffered by Frank Williams, yet they failed to adequately warn and/or protect Frank Williams from inhaling these dangerous fibers.

77.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable to Petitioners for the damages sustained as a result of Frank Williams' contraction of mesothelioma and other related ill health effects that resulted in his death. Petitioners are entitled to damages for the following, individually and on behalf of Frank Williams:

a.   Past, present, and future physical pain and suffering;

b.   Past, present, and future mental pain and anguish;

c.   Past, present, and future loss of income;

d.   Past, present, and future medical expenses;

e.   Loss of the enjoyment of life;

f.   Wrongful death;

g.   Survival damages; and

h.   Any and all other damages which may be available under the law and/or
     proven at trial of this matter.

### 78.

All of the hereinabove named defendants are jointly, severally, and *in solido* liable for all damages suffered as a result of Frank Williams' contraction of mesothelioma and other related ill health effects that resulted in his death.

### 79.

A trial by jury is requested on all issues.

**WHEREFORE,** Petitioners, Tarsia Williams and Breck Williams ("Petitioners"), the only children of the original Petitioner, Frank Williams, Jr., pray that all defendants named herein be duly cited to appear and answer, and that after all due proceedings are had, that there be judgment rendered herein in favor of Petitioners and against all defendants for all damages allowed under law, together with legal interest and all costs associated with the prosecution of this claim. Petitioners further pray for all other general and equitable relief as is just and/or allowed under the law.

Respectfully submitted,

**DIDRIKSEN LAW FIRM**

**/s/ Caleb H. Didriksen**
Caleb H. Didriksen, La. Bar No. 1334
Diane R. Cosenza, La. Bar No. 4419
Michael D. Lane, La. Bar No. 30364
3114 Canal Street
New Orleans, LA 70119
Tel: 504-586-1600
Fax: 504-822-3119
Email: caleb@didriksenlaw.com
       diane@didriksenlaw.com
       mike@didriksenlaw.com

*Attorneys for Petitioners*

## CERTIFICATE OF SERVICE

I certify that on the 25th day of January, 2013, the foregoing pleading was electronically filed with the Clerk of Court by using the CM/ECF system pursuant to the rules and procedures of the United States District Court for the Eastern District of Pennsylvania and served in accordance therewith upon all counsel of record.

/s/ Caleb H. Didriksen

**PLEASE SERVE (1) THE SUMMONS, (2) ORIGINAL PETITION FOR DAMAGES AND FIRST AMENDED PETITION FOR DAMAGES ATTACHED HERETO, AND (3) THE FOREGOING SECOND AMENDED AND SUPPLEMENTAL PETITION FOR DAMAGES ON THE FOLLOWING:**

**CSR, LTD.**
Through the Hague Convention:
9 Help Street
Chatswood, NSW 2067
Australia

**ADVOCATE MINES, LTD.**
Through the Hague Convention:
Winn Oughtred
Border, Ladner & Gervais, LLP
40 King Street West, Suite 4100
Toronto, Canada M5H 3Y4

**THE BOEING COMPANY**
Through its agent for service of process:
Corporation Service Company
320 Somerulos Street
Baton Rouge, LA 70802

**SEVILLE, INC.**
Through its agent for service of process:
Gary M. Zwain
3838 N. Causeway Boulevard
Lakeway Three, Suite 2900
Metairie, LA 70002

**STANDARD SERVICES COMPANY, INC.**
Through its agent for service of process:
E. M. Hadden
14694 Airline Highway
Destrehan, LA 70047

**AIR PRODUCTS & CHEMICALS, INC.**
Through its agent for service of process:
C.T. Corporation System
5615 Corporate Boulevard, Suite 400B
Baton Rouge, LA 70808

**EXXON MOBIL CORPORATION**
Through its agent for service of process:
Corporation Service Company
320 Somerulos Street
Baton Rouge, LA 70802

**NEW NGC, INC.**
Through its agent for service of process:
The Prentice-Hall Corporation System, Inc.
320 Somerulos Street
Baton Rouge, LA 70802

**INSULATION TECHNOLOGIES, INC.**
Through its agent for service of process:
Michael D. Peytavin
401 Whitney Avenue, Suite 500
Gretna, LA 70056

**HY-TECH ROOFING SERVICES, INC.**
Through its agent for service of process:
Lester J. Haydel, Jr.
14 Rosedown Drive
Destrehan, LA 70047

**LOU-CON, INC.**
Through its agent for service of process:
Michael R. Carson
3100 East St. Bernard Highway
Meraux, Louisiana 70075

**THE GOTTFRIED CORPORATION**
Through its agent for service of process:
Karl Gottfried, III
6 Meyers Road
Covington, Louisiana 70435

**ENVIRONMENTAL ABATEMENT SERVICES, INC.**
Through its agent for service of process:
R. Gray Sexton
8675 Bluebonnet Boulevard, Suite C
Baton Rouge, Louisiana 70810