# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| **BRECK WILLIAMS** and **TARSIA WILLIAMS** *versus* **LOCKHEED MARTIN, ET AL** | **CIVIL ACTION NO.** 2:09-cv-00065 c/w 2:16-cv-13136 **JUDGE: IVAN LEMELLE** **MAGISTRATE: KAREN WELLS ROBY** |

**PLAINTIFFS' OPPOSITION TO THE STATEMENT OF "UNCONTESTED" FACTS FILED BY BOEING IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Generally, Boeing's statement of uncontested facts is an outline of the procedural posture of the case. It does not identify any "facts" which are "undisputed."

**1.** Decedent, Frank Williams, worked at NASA's Michoud Assembly Facility ("MAF") from 1966-1968 for Chrysler; and from 1974-1978 and 1980-1993 for Martin Marietta. Social Security Records, Exhibit 4.

**2.** Objection. Procedural occurrence and not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009). This is a procedural issue, entirely separate from the instant summary judgment motion.

**3.** Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. This is a procedural issue, entirely separate from the instant summary judgment motion.

1

4. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. This is a procedural issue, entirely separate from the instant summary judgment motion.

5. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. This is a procedural issue, entirely separate from the instant summary judgment motion.

6. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. This is a procedural issue, entirely separate from the instant summary judgment motion.

7. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. This is a procedural issue, entirely separate from the instant summary judgment motion.

8. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. This is a procedural issue, entirely separate from the instant summary judgment motion.

   a. In further objection, Plaintiffs note that Plaintiffs issued discovery to Boeing. Boeing was ordered by former Magistrate Judge, now Fifth Circuit Judge Dana Douglas to search the MAF for additional responsive documents. Doc. R. xx.,

date. Boeing asked this Court for clarification of that order. Doc. R. xx., date. Boeing's relief was denied. Doc. R. xx., date. To date, Boeing has not provided Plaintiffs with any evidence that it has complied with the Order. Doc. R. xx., date. In addition, on xx, Plaintiffs issued additional discovery to Boeing in the form of additional interrogatories and requests for Production. This Court declined to allow the additional interrogatories, which were in excess of the limitations created by the Federal Rules of Civil Procedure. Doc. R. 373., Mar. 14, 2023. However, Boeing has not yet responded to the additional Requests for Production

b. Boeing's corporate designee, Howard Hamilton, sat for a deposition on October 19, 2023. Hamilton was unfit and underprepared to serve as a corporate designee. He admitted that he had not reviewed a single Boeing document which had not been provided by Plaintiffs, had not spoken to anyone else, did not have any access to any Boeing information because Boeing did not provide him with sign-on credentials to their on-line document repository, and had no information about any of Plaintiffs' noticed areas of deposition. This deposition is subject to a pending Motion to Compel Rule 30(b)(6) deposition. Doc. R. 282, Oct. 31, 2022.

c. Plaintiffs object to the characterization of George Stemley as a "star" witness. Mr. Stemley was a co-worker and friend of Mr. Williams who offered the information he recalls from their time at the MAF, nearly 40 years ago, and who recently gave his first deposition, some of which questions were based upon an affidavit which he helped to draft about 10 years ago, when he was 10 years younger.

d. Morgan Watson was deposed.

3

03212023537

9. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. In 2023, Mr. Stemley testified that he recalled Mr. Williams working in Buildings 350 and visiting 351. In 2013, Mr. Stemley testified via affidavit that he recalled Mr. Williams working in and visiting the buildings 350, 351, 101, 102, 103, and possibly others. Stemley affidavit Aug. 13, 2013.

10. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325.

According to Boeing, *via* corporate representative Howard Hamilton, it was continuously present at the MAF from the early 1960s through 1983.

> "Boeing had a presence at MAF beginning in the early 60s, '62-'63 time frame because they were the prime contractor for the S-1C stage of the Saturn 5 which was produced there so Boeing had a presence there beginning like I said maybe '62 and then that program you know went through roughly 1974."

Hamilton depo, p. 24 (**Exhibit 9**). At that time, Boeing was at the MAF pursuant to NAS8-5608, the Saturn Prime Contract and contract NAS8-5060(F), a related facilities contract.

After the Saturn program wound-down, Lockheed was granted the prime contract at the MAF to build the External Tanks for the Space Shuttle. Lockheed then awarded Boeing aa subsequent facilities subcontract over the MAF because of Boeing's expertise regarding the MAF facilities that it had accumulated while acting as FOC during the Saturn Program. *See,* Hamilton depo. at 179, **Exhibit 9**. Thus, from 1974 through 1983, while Lockheed produced the External Fuel Tanks for the Space Shuttle Program, Boeing served as the Facility Operations Contractor. Hamilton depo, p. 24, 48, **Exhibit 9**; Field Hearings, 2/14/76, U.S. House of

4

Representatives Committee on Science and Technology Subcommittee of Space Science and Applications, **Exhibit 1** (Chair Don Fuqua: "Boeing is our support contractor.").

Boeing itself has explained when it was present at the MAF: starting in 1974, Lockheed delegated to Boeing facilities and maintenance and repair work. That work included the "maintenance and operation of all facility systems and equipment acquired and installed under the prime facilities contract." Boeing's Notice of Removal, *Addotto v. Equitable Shipyards*, ED LA. 13-5807, Doc. Rec. No. 1, Sept. 11, 2013 p. 5-6, **Exhibit 2**.[1] Lockheed repeatedly and continuously renewed Boeing's subcontract through 1983 so that Boeing stayed responsible for MAF facilities. *See*, Boeing's Opposition to Motion to Remand, *Addotto*, Oct. 17, 2013, Doc. Rec. No. 18, p. 11, **Exhibit 3**, (claiming to be subject to Martin Marietta Corporation-Boeing Aerospace Company Sub-Contract Numbered 5338, May 1, 1980, **Exhibit 4**.)

When Lockheed delegated its facilities maintenance duties and responsibilities to Boeing, "Boeing literally stepped into Lockheed's shoes with regard to those duties." *See,* Boeing's Sur-Reply in Opp. To Motion to Remand, *Addotto*, Doc. Rec. No. 27 p. 6-7 (**Exhibit** 5); Boeing claimed to be subject to Contracts NAS8-30300 (**Exhibit 6**), NAS8-30382, **Exhibit 7**, and "Safety Regulations for Contractors and Subcontractors Working on Government Property at Michoud Assembly Facility" **Exhibit 8**. *Id*.

It is of no moment that Mr. Stemley could not testify regarding Boeing's work at the MAF when there is ample record of Boeing's work by other sources and by its own admissions.

---

[1] While not made in this proceeding, Boeing's assertions in the matter of *Addotto v. Equitable Shipyards*, ED LA, No. 13-5807, are judicial concessions pursuant to La. C.C. art. 1853 which constitute full proof against the party who made it, even if made by the party's attorney. La. C.C. art. 3021.

03212023537

**11.** Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325.

Further, other documents and Boeing's own testimony demonstrate Boeing's role in construction, direction, and control of installation efforts at the MAF. As the FOC, Boeing "planned, designed, contracted, installed and maintained the facilities and equipment used on the Saturn Apollo S-1C stage production and test operations at Michoud." Hamilton Dep. at 40-42, Exhibit 9. That included planning, designing, and implementing a $15 million brick and mortar modification program including facilities, planning, design and construction management, designing and maintaining the HVAC system, the communication equipment and services and the electrical distribution system. Hamilton at 45, 52, 56, Exhibit 9; Preventive/Corrective Maintenance, Minor In-Plant Construction and Rearrangement/Alteration Services, Part 1 Technical Proposal, Boeing Aerospace Company Field Operations and Support Division (hereinafter "1976 Proposal"), **Exhibit 24**, Bates No. 7132-7265, at 7144.[2]

To keep the MAF facilities contract, Boeing periodically issued new technical proposals to Lockheed. In its 1976 Proposal, Boeing lauded its work under the Saturn program at the MAF (from 1963-1974) as having served as the facilities planning, design and construction management, architect and engineer management at the MAF. *Id.* at 7145. Boeing claimed to have operated and maintained 1,200,000 square feet of brick-and-mortar facilities that included: the air conditioning systems, buildings, communications, electrical distribution systems,

---

[2] Boeing corporate representative Hamilton explained that he could not authenticate the document, he saw no reason to doubt its veracity. Hamilton depo. at p. 40, Exhibit 9. Further, Hamilton testified that the documents related to the facilities would have been left at the MAF when Boeing closed out its contract as part of Boeing's ordinary business operations. Hamilton depo. at p/ 70-72, Exhibit 9.

6

elevators, overhead hangar doors, janitorial services and lighting. *Id.* Boeing further boasted that:

> Boeing Company personnel planned, designed, constructed, installed and maintained the facilities and equipment used on Saturn/Apollo S-1C Stage production and test operations at Michoud. Many of these facilities and equipment are currently being used by Martin Marietta Corporation to accomplish the External Tank Project. Boeing preventive and corrective maintenance services were performed at Michoud under Contracts NAS8-5608 and NAS8-5606(F), and services are currently being performed by Boeing under contract to the Martin Marietta Corporation – Michoud.

*Id.* at 7140.

Boeing also described its construction and modification responsibilities, material handling, plant engineering, providing criteria, drawings, estimates and specifications for modification to existing or new plant systems, drafting services, layout plans, and master planning and facilities operator. As facilities operator, Boeing oversaw plant engineering, maintenance and operations, and all building utilities systems, particularly heating, air-conditioning, water distribution, sewerage, communication, and electrical distribution. It provided engineering support, and central work control. Further, Boeing operated two large industrial cafeterias, and operated a procurement system including storage, etc. to support total FOC activities. *Id.* at 7146. Cumulatively, this work required Boeing to:

> **maintain and operate all Michoud common-use facilities and equipment up to the point of tenant/contractor interface**. This responsibility consists of over 3.5 million square feet of covered space and 89- acres of land, and over 20 major buildings and their associated utility systems.

*Id.* at 7147 (emphasis added). Under Boeing's Proposal, there was no area of facilities work that Boeing did not claim credit or responsibility for.

In the 1976 Proposal, Boeing accepted responsibility, custody and *garde* of the MAF for the duration of its work there, including, notably, some of the areas most contaminated with dangerous ACBM – the air conditioning systems, insulated plumbing lines, the cafeteria, and the communication system (which, while progressively installed throughout the 1970s, 80s and 90s disturbed existing ACBM as it was pulled into place above the drop ceilings) and the procurement of any newly-installed ACBM.

Boeing and Lockheed executed a final FOC contract for the MAF on May 1, 1980 for two years, with two one-year extension options. Contract No. 5338, May 1, 1980, Bates No. 7266-7285, attached hereto as Exhibit 18. Contract's 5338's description of Boeing's responsibilities thereunder describes the same scope of work outlined in the 1976 Proposal. See, e.g., *Id.* at Statement of Work, 7278-7284.[3]

        a)     Historical newspaper articles and other records corroborate Plaintiffs' understanding of Boeing's work and responsibilities at the MAF.

Contemporaneous newspaper articles and ads confirm the work Boeing was performing and responsible for as FOC at the MAF. Of particular note, on July 9, 1974, Boeing ran an ad explaining that Boeing was seeking qualified persons "in connection with a potential NASA Facility operating contract at the Michoud Plant" including "Industrial Plant Maintenance, Personnel – all skills, Plant Engineers, Maintenance Engineers, and a host of others. Times-Picayune, July 9, 1974, **Exhibit 9**. Then, on November 30, 1974, Boeing announced in a

---

[3] Plaintiffs note that Contract 5338 is one of the documents which Plaintiffs located at the MAF, which Boeing used to support its removal in the *Addotto* matter, which Boeing failed to disclose to Plaintiffs it had previously told this Court was a valid contract and which is the subject of Plaintiffs' pending Motion for Sanctions. Regardless, Boeing testified that an FOC contract between Lockheed and Boeing was executed in 1980, even as Boeing has argued that this contract is inadmissible or inauthentic. Even if this paper was not the final signed version of the contract, there is no dispute that Boeing remained as the FOC at the MAF from 1980 through 1983 and that its duties included the HVAC, electrical and communications systems, and minor building alteration and repairs. Hamilton dep. 117-118, Exhibit 9.

subsequent Times-Picayune ad that it had been awarded the operational contract at the MAF. Times-Picayune, Dec. 2, 1974 attached hereto as **Exhibit 10**. It was soliciting industrial plan maintenance workers for all crafts, industrial medical personnel, safety, electrical, mechanical, layout, planning, architectural and structural engineers, and supervisory personnel. *Id.*

Boeing was scheduled to begin the contract on Jan. 1, 1975 and take full control on Feb. 1, 1975. "Boeing Lands Michoud Pact" Florida Today, p. 14C, **Exhibit 11**. Three hundred people were scheduled to work for Boeing under the FOC in plant engineering, maintenance and operation of the facilities, institutional support, medical and other support services. *Id.* The scope of Boeing's work as the FOC simply cannot be understated.

        b)      Other facilities contracts corroborate the type of work Boeing performed at the MAF as FOC.

Boeing has not produced the actual subcontract it had with Lockheed.[4] However, prior FOC contracts show that the FOC responsibility is the same as what Boeing described in its 1976 proposal. For instance, under Contract NAS8-5618, the previous FOC, Mason Rust, was responsible for furnishing all personnel, facilities, equipment and materials for Medical Service, Custodial Service, Plant Maintenance and Repair Service. Exhibit 24. As FOC, Mason Rust assumed all management, operation and maintenance responsibilities for the various medical, custodial, plant maintenance and repair, engineering and other services. Boeing has provided no evidence that the terms of the FOC changed meaningfully over time.

---

[4] On March 16, 2023, this Court upheld the discovery order issued by former Magistrate Judge, now Fifth Circuit Judge Dana Douglas, ordering Boeing to look for relevant contracts and document at the MAF. Boeing has not yet complied with this order.

9

03212023537

### 2. Specifically, Boeing designed, approved, installed, and caused to be installed asbestos at in Buildings 350, 351 and 103.

In addition to being responsible for all of the asbestos in all of the facilities at MAF, by virtue of its custodianship and control of the buildings, from 1974-1983, Boeing specifically designed, approved, installed and caused to be installed substantial amounts of asbestos at MAF.

Boeing claimed credit for having performed during its Saturn tenure was supervision of all architect and engineer services at the MAF their associated schedules monetary controls and reporting thereof.  1976 Proposal at 7145, **Exhibit 24**.

Boeing claimed to have performed all maintenance on the specialty systems and air conditioning systems at MAF: 1976 Proposal at 725, **Exhibit 24**. The return air plenum of the HVAC system in buildings 350 and 351 was coated with asbestos spray fireproofing. Asbestos Survey.

That Mr. Stemley could not testify about Boeing's contractual obligations is of no moment when other documents and witnesses can testify about the same.

**12.** Objection.  Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment.   A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325.

Whether or not Mr. Williams worked with or around other Boeing employees is not an issue of genuine material fact.  The evidence demonstrates that Boeing controlled the asbestos to which Mr. Williams was exposed as the FOC.  The evidence demonstrates that Boeing caused asbestos to be installed at the MAF.  The evidence demonstrates that Boeing failed to remediate the known and dangerous asbestos and that it failed to warn Mr. Williams and his co-workers of its presence and its danger.  In the 1976 Proposal, Boeing accepted responsibility, custody and *garde* of the MAF for the duration of its work there, including, notably, some of the areas most

contaminated with dangerous ACBM – the air conditioning systems, insulated plumbing lines, the cafeteria, and the communication system (which, while progressively installed throughout the 1970s, 80s and 90s disturbed existing ACBM as it was pulled into place above the drop ceilings) and the procurement of any newly-installed ACBM.

Boeing and Lockheed executed a final FOC contract for the MAF on May 1, 1980 for two years, with two one-year extension options. Contract No. 5338, May 1, 1980, Bates No. 7266-7285, attached hereto as Exhibit 18. Contract's 5338's description of Boeing's responsibilities thereunder describes the same scope of work outlined in the 1976 Proposal. See, e.g., *Id.* at Statement of Work, 7278-7284.[5]

Because was responsible for and caused Frank Williams' asbestos exposure, where other Boeing employees worked is not a material fact. Regardless, there is also testimony that Boeing was scheduled to begin the contract on Jan. 1, 1975 and take full control on Feb. 1, 1975. "Boeing Lands Michoud Pact" Florida Today, p. 14C, **Exhibit 12**. Three hundred people were scheduled to work for Boeing under the FOC in plant engineering, maintenance and operation of the facilities, institutional support, medical and other support services. *Id.*

**13.** Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. What Mr. Williams did at his desk at the MAF is not a material fact. Plaintiffs have alleged that Mr. Williams was exposed to asbestos

---

[5] Plaintiffs note that Contract 5338 is one of the documents which Plaintiffs located at the MAF, which Boeing used to support its removal in the *Addotto* matter, which Boeing failed to disclose to Plaintiffs it had previously told this Court was a valid contract and which is the subject of Plaintiffs' pending Motion for Sanctions. Regardless, Boeing testified that an FOC contract between Lockheed and Boeing was executed in 1980, even as Boeing has argued that this contract is inadmissible or inauthentic. Even if this paper was not the final signed version of the contract, there is no dispute that Boeing remained as the FOC at the MAF from 1980 through 1983 and that its duties included the HVAC, electrical and communications systems, and minor building alteration and repairs. Hamilton dep. 117-118, Exhibit 9.

from the in-place and degrading asbestos in the buildings, especially in the HVAC system. As long as Mr. Williams was breathing while he was in Buildings 350, 351 and 103, he was being exposed to airborne asbestos fibers. Both Buildings 350 and 351 were large steel framed buildings whose steel members were coated with spray-applied asbestos fireproofing. A false, drop ceiling of acoustical tiles separated the asbestos fireproofing-covered steel beams from the office, cafeteria, and other workspaces. Mr. Williams and his co-workers worked and ate beneath the acoustical tiled ceiling. It is well-understood that asbestos spray-on fireproofing is especially dangerous in the following ways: first, the fireproofing contains a high percentage of particularly dangerous amosite asbestos fibers. Second, by spraying the asbestos on, the asbestos is not well-encapsulated and becomes easily broken free from materials. The asbestos fibers are more likely to delaminate from the fireproofing, to become friable and airborne. Third, asbestos fibers are invisible to the naked eye, so people exposed may be entirely unaware of the danger or the presence of asbestos fibers if they have not been adequately warned.

Because of the HVAC system design of Buildings 350 and 351, under its normal, daily operations, the HVAC systems would draw air from that return air plenum into the HVAC system for cooling and distribution throughout the buildings. The air movement of the HVAC and normal building operations caused the asbestos fibers in the fireproofing to delaminate from the steel frames, and to accumulate like dust on top of the ceiling tiles. The asbestos dust was circulated throughout Buildings 350 and 351 daily, exposing Mr. Williams and his co-workers to invisible and dangerous asbestos fibers.

The type of asbestos-exposure suffered by Frank Williams was more invisible than the types of exposure suffered by craftsman who worked near insulators, for example. Nevertheless, Frank Williams was equally exposed even though he did not know that the air he had breathed

was full of asbestos particles. As Frank Parker explained, where asbestos material is concentrated in the overhead spaces, when the thermal system insulation deteriorates, the asbestos fibers "get sucked into the return air and distribution system and put out to the entire building". Parker dep. Oct. 28, 2013, Exhibit 5. This HVAC design was "the worse scenario for making sure everybody – the asbestos gets distributed throughout the building." *Id.*

This regular exposure to airborne asbestos caused Frank Williams' mesothelioma.

By 1984, there was:

> "increasing concern about exposures to asbestos has brought about the need for recognition and identification of these materials in the workplace environment. Medical evidence has established asbestos to be a potent carcinogen and associated it with a debilitating lung disease, asbestosis; a rare cancer of the chest and abdominal lining, mesothelioma; and cancers of the lung, esophagus, stomach, colon and other organs. Scientific evidence indicates exposures to any level of asbestos involves some degree of health risk, although this risk cannot be reliably estimated."

Asbestos Survey, p. 1. In response, immediately following Boeing's extended tenure at the MAF, Lockheed sought to protect its workers in a way Boeing had long ignored – it contracted with Environmental Measurements Corporation and West-Paine Laboratories, Inc. to identify all of the asbestos materials in place at the MAF. Asbestos Survey, p. 2-6. By the time Boeing left the MAF, the asbestos in Buildings 350 and 351 was already in poor condition, friable, delaminating and dangerous to the occupants of the building while Frank Williams was an occupant.

Thus, Verret noted that the asbestos fibers were circulated and re-circulated through the ventilation system into the work environment, exposing Mr. Williams and his co-workers to airborne asbestos on a regular basis:"

13

> "[t]he spray-applied fibrous insulation in Building 350 and 351 has the greatest potential for fiber release of all items noted. This material is old and delaminating from the structural components on which it was sprayed. Additionally, erosion of the material occurs due to air movements as it is located in the return air plenum of the ventilation system... Abatement procedures here would be complex and costly. This fibrous material would be a poor candidate for encapsulation because of its extremely friable nature, its delamination from the substrate and the uneven thickness of its application. The only effective abatement procedure would appear to be removal."

Asbestos Survey. Verret found dangerous amosite asbestos fibers in each wing and on every floor of Building 350 and 351. *Id.* Of additional concern, every single sample which tested positive in Buildings 350 and 351was positive for the substantially more dangerous amosite asbestos. Asbestos Survey, Aug. 21, 1984. The results demonstrate a truly dangerous work environment by the time Boeing left the MAF.

In addition, the Asbestos Survey demonstrates the depth of information available regarding the MAF buildings in the early 1980s. The Engineering Building (350), its associated cafeteria and boiler house (351) and cooling tower (352) were constructed as an integrated system. Asbestos Survey,1984; Verret noted that he used as-built plans, construction pans, material certifications and blueprints (which Boeing would have had access to during its many years as FOC) to identify asbestos-containing material in the buildings. Anyone who had access to the construction plans, material certifications blueprints or as-built plans of the MAF buildings would have or should have known of and understood the ACBM contained in the buildings.

Parker explained that mesothelioma can occur in ordinary office workers, like Williams because '[p]revalent levels of airborne [asbestos] inside buildings with ACM may be 10 to 100 times higher than outdoor levels." Parker Report, July 31, 2013, Exhibit **13**. Further, Parker concluded that "in an asbestos-rich environment, such as that found in Buildings 101, 102, 350

14

03212023537

and 351, all of which contain a significant about of ACBM, the result most likely was a fluctuating low concentration of asbestos in the air **that was, more likely than not, frequently in excess of average ambient concentrations. These elevated asbestos concentrations would have increased Mr. Williams' overall asbestos dose and, consequently, increased his risk of developing an asbestos related disease, including mesothelioma**." *Id.*

Parker explained that asbestos installed in 1963 which is releasing friable asbestos fibers into the air does not stop doing so unless and until it is remediated in some way:

> "Asbestos fibers do not decompose after release into the environment. … Once buildings are contaminated with respirable asbestos fibers, the fibers do not magically disappear or leave, and for the most part, remain on the premises and re-suspend in the air. Thus cycling of deposition and re-suspension can continue for years."[6]

Parker Report, Feb. 17, 2014, Exhibit 37.

As Frank Parker explained, where asbestos material is concentrated in the overhead spaces, when the thermal system insulation deteriorates, the asbestos fibers "get sucked into the return air and distribution system and put out to the entire building". Parker dep. Oct. 28, 2013, Exhibit 12. This HVAC design was "the worst scenario for making sure everybody – the asbestos gets distributed throughout the building." *Id.*

14. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. Boeing has explained its own work at the MAF. See, Objection to "Fact" no. 12.

15. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would

---

[6] Parker Report, Feb. 17, 2014, at p. 2, ROA __, (ED PA 9-70101, ECF Doc No. 382) Record Excerpt P

change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. Plaintiffs do not allege that Frank Williams was exposed as a result of his work with Saturn V, but as an office worker exposed to asbestos-containing building materials at his desk and cafeteria. See, objections above.

16. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. Plaintiffs' experts, Parker and Farris have instead explained how Williams was exposed to asbestos injured at the MAF.

17. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. See, Objections above explaining Plaintiffs' allegations of exposure and Boeing's descriptions of its own work.

18. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. See, Objections above explaining Plaintiffs' allegations of exposure and Boeing's descriptions of its own work.

19. Objection. Not a material fact and has no bearing on the outcome of the current Motion for Summary Judgment. A fact is "material" if resolving it one way or another would change the outcome of the lawsuit. *Sossamon*, 560 F.3d at 325. There is ample evidence discussed above explaining how Mr. Williams was exposed and the effects of such exposures. See, Objections above explaining Plaintiffs' allegations of exposure and Boeing's descriptions of its own work.

16

03212023537

20. Objection. No fact is alleged in this alleged "undisputed fact." There is much evidence that Frank Williams sustained exposures to asbestos due to the fault of Boeing, see affidavit and deposition of Frank Parker and the other citations herein and in the Memorandum in Opposition to Motion for Summary Judgment, and the conclusions of the Fifth Circuit that there is sufficient evidence in the record already to make it a jury question as to whether Boeing's actions and inactions were a substantial cause of Frank Williams' mesothelioma.

## PROPOSED UNDISPUTED FACTS ALLEGED BY PLAINTIFF

1. Facilities Management Contracts were held to control and have garde over the whole physical plant at the Michoud Assembly Facility by Boeing was the prime contractor/FOC from 1964 to 1974 and was the subcontracted FOC from 1974 – 1983

2. Frank Williams died of mesothelioma, a lung disease which is only associated with asbestos exposure.

3. The deteriorating spray-on insulation in Building 350 had a high percentage of Amosite fibers.

4. Amosite asbestos fibers are more dangerous and lethal to humans than are chrysotile fibers.

5. When Building 350 was torn down, all of its contents were treated as toxic because just a little jostling of the structure resulted in the entire building becoming dusted with asbestos fibers.

6. Boeing had full control of Buildings 103, 350 and 351 and their failing asbestos from 1964 through and including 1983.

7. Boeing failed to eliminate or warn of the very hazardous asbestos in the air in Buildings 103, 350 and 351 during the years Boeing had legal garde thereof.

Respectfully submitted,

Didriksen, Saucier & Woods, PLC


*/s/ Caleb H. Didriksen*
Caleb H. Didriksen, La. Bar No. 1334
3114 Canal Street
New Orleans, LA 70119
Tel.: 504-586-1600

18

03212023537

Fax: 504-822-3119  
Email: caleb@DSWLawFirm.com  
Attorney for Plaintiffs

**CERTIFICATE OF SERVICE**

I certify that on March 21, 2023 the foregoing pleading was electronically filed with the Clerk of Court by using the CM/ECF system pursuant to the rules and procedures of the United States District Court for the Eastern District of Louisiana and served in accordance therewith to all counsel of record.

/s/ Caleb H. Didriksen, III

**Caleb H. Didriksen, III**

1